IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>JACOB A. BRUN,<br><br>　　　　　Defendant. | Case No. 8:20CR38<br><br>**ORDER AND FINDINGS AND RECOMMENDATION** |

　　　This matter is before the Court on Defendant's First Motion to Dismiss (Filing No. 37), Second Motion to Dismiss (Filing No. 39), Motion to Suppress (Filing No. 41), and Motion to Sever (Filing No. 44). An evidentiary hearing was held on the motions on October 28, 2020. At the hearing, the Court took judicial notice of the government's Exhibits 1 through 5 for purposes of the motions. (TR. 75-76.) The Court also received Defendant's Exhibit 101. (TR. 77.) A transcript was prepared and the motions are now ripe for disposition.

　　　For the reasons explained below, the undersigned will recommend that each motion to dismiss and the Motion to Suppress be denied. Additionally, the undersigned will order that the Motion to Sever be denied.

**FACTS**

　　　Deputy Sheriff Austin Pratt ("Deputy Pratt") of the Douglas County Sheriff's Office testified at the evidentiary hearing in this case. (TR. 9.) Deputy Pratt has been working on narcotics investigations for five years. (TR. 10.) In addition to being a deputy sheriff with Douglas County, he is a full-time member of the Federal Bureau of Investigation's ("FBI") Transnational Organized Crime Western Hemisphere Task Force Group ("TCO"). (TR. 9.) Deputy Pratt stated he has been a sworn task force officer for two years. (TR. 9.) Deputy Pratt testified that as a task force officer, he has credentials with the FBI and was sworn in as a special investigator with the U.S. Marshals Service. (TR. 10.) Deputy Pratt testified that as a task force officer, he can investigate narcotics infractions as well as other criminal infractions. (TR. 10.) Deputy Pratt stated that his duties as a task force officer do not include executing state arrest warrants. (TR. 51.) It is Deputy Pratt's understanding that he has been deputized by the federal agencies. (TR. 10.) Deputy

Pratt testified that he has authority under 18 U.S.C. § 21, which makes him doubly deputized for task force officer purposes. (TR. 10.)

Deputy Pratt stated that he typically works longer than a 40-hour workweek and that most of his work time is spent with the FBI. (TR. 10-11.) Deputy Pratt testified he has training requirements for both the Sheriff's Office and FBI. (TR. 44.) Deputy Pratt has an office at both the Sheriff's Office and the FBI. (TR. 42.) Deputy Pratt testified that he is paid by the Sheriff's Office and does not receive a check from the FBI. (TR. 41.) The FBI pays for Deputy Pratt's overtime, but the FBI reimburses Douglas County so Deputy Pratt is not issued a check by the FBI. (TR. 43.) However, the FBI provided Officer Pratt with a 2019 Jeep Grand Cherokee to use as his work vehicle. (TR. 11.) The Jeep is only assigned to him and he typically drives it while on duty. (TR. 11.) Deputy Pratt was driving the Jeep at the time of the events underlying this motion. (TR. 11.)

Deputy Pratt testified that in November, 2019, he received information that Defendant was a methamphetamine dealer. (TR. 12.) Deputy Pratt testified he was looking at Defendant as a potential federal narcotics target, but he did not file an FBI case opening memo at that time. (TR. 12; TR. 58.) Deputy Pratt testified that he learned through his background investigation into Defendant that he had two outstanding state-issued warrants. (TR. 12.) One of the warrants was issued by Douglas County Court for flight to avoid. (TR. 12.) The other warrant was a state district court warrant for a probation violation on a felony possession of a controlled substance charge.[1] (TR. 12-13; Ex. 4; Ex. 5.) Deputy Pratt testified he reached out to Defendant's probation officer and told him he wanted to speak to Defendant and to determine whether the probation officer could search Defendant's residence. (TR. 60-61.) The terms of Defendant's probation order required that Defendant "[r]eport as directed by the Court or probation officer and permit the probation officer to visit the defendant at all times and places. The Defendant is to submit to reasonable search and seizures of his person, home, and vehicle by all law enforcement and probation officers." (Ex. 4.) During Deputy Pratt's conversations with Defendant's probation officer, the probation officer asked for his assistance to get Defendant into custody. (TR. 13.)

---

[1] Defendant failed to appear for the hearing on his alleged probation violation, which resulted in this warrant. (Ex. 5.)

On December 19, 2019, Deputy Pratt and other officers decided to set-up an operation to apprehend Defendant. (TR. 12.) The Douglas County Sheriff's Emergency Service Unit ("ESU") was tasked with apprehending Defendant. (TR. 46.) Deputy Pratt testified that the plan was to take Defendant into custody outside his residence and then probation would search Defendant's residence with the assistance of Douglas County deputies. (TR. 72-73.) Deputy Pratt testified that he often works with the state probation office to assist with searches of houses and take individuals into custody.[2] (TR. 13.) Deputy Pratt testified that before law enforcement began their efforts to apprehend Defendant, a briefing took place at the Sheriff's Office. (TR. 50.) Deputy Pratt stated there was not anyone at the meeting who was not a paid employee of the Sheriff's Office. (TR. 51.) Deputy Pratt testified that at the time they were trying to apprehend Defendant on December 19, 2019, he was acting with the Sheriff's Office ESU. (TR. 46.)

Deputy Pratt testified that in situations in which a warrant is issued for flight to avoid, officers take extra precautions in conducting the arrest. (TR. 13-14.) Deputy Pratt stated that these warrants provide reasonable suspicion that a traditional traffic stop will not work and officers do not want the individual to run and potentially hurt the public. (TR. 14.) Typically, multiple officers or investigators serve those types of warrants so officers can control the scene and for safety. (TR. 14.)

On December 19, 2019, various officer and probation vehicles positioned themselves within three blocks to the north, south, east, and west of Defendant's residence, which is located at 4157 K Street in Omaha, Nebraska.[3] (TR. 15.) Officers observed Defendant getting into a gray Honda Accord with a female and a male and then depart the residence. (TR. 15.) Deputy Pratt testified that he was at approximately 42nd and L Street when another task force officer told him that she saw Defendant exit the residence along with two other parties. (TR. 15-16.) Deputy Pratt testified that he then traveled to the area and observed Defendant driving the Accord westbound on K Street approaching 42nd Street. (TR. 14.) A marked patrol unit was directly in front of Deputy Pratt traveling eastbound on K Street as Defendant was traveling westbound on K Street

---

[2] Deputy Pratt testified that state probation officers do not have the authority to arrest individuals and do not carry weapons. (TR. 13.)

[3] This is the address Defendant gave to probation as his residence. (TR. 33.) Officer Pratt testified that he also observed Defendant coming from that residence in prior surveillance. (TR. 34.)

3

so they met head-to-head on K Street. (TR. 16.) The marked unit was visible to Defendant and had its lights and sirens on. (TR. 15-16.)

Deputy Pratt testified that Defendant did not stop his vehicle. (TR. 17.) Defendant put the Accord in reverse and reversed up to 41st Avenue and then reversed north up 41st Avenue. (TR. 17.) At that point, Officer Pratt activated the lights and sirens on his Jeep. (TR. 17.) Defendant then traveled one block north up to J Street, and then reversed to the west against the southbound curb. (TR. 18.) A cruiser entered the intersection and blocked eastbound J Street. (TR. 18.) Deputy Pratt testified there was an alley slightly to the west and he attempted to block that intersection, but he was unable to get to that position before he encountered Defendant. (TR. 18.)

Deputy Pratt testified that as he entered the intersection to get to the alley, Defendant accelerated and turned into his Jeep and hit its driver's side door. (TR. 18; Ex. 1, 3.) Deputy Pratt testified Defendant was driving under ten miles-per-hour when he struck him. (TR. 53.) Deputy Pratt testified that he did not hear tires squealing or anything indicating Defendant was braking. (TR. 18.) There were no skid marks at the scene of where the vehicles collided. (TR. 19.) Deputy Pratt testified that from his observations, Defendant could have avoided hitting the Jeep, but Defendant accelerated towards him. (TR. 69.)

Deputy Pratt testified that after the Jeep was struck, he got behind the door pillar of his vehicle and drew his service weapon because he feared for his safety. (TR. 29-30.) Deputy Pratt stated he was pinned in his vehicle and could not get out. (TR. 30.) Deputy Pratt testified he did not know if Defendant had a weapon at that point. (TR. 30.) Deputy Pratt stated that as he peered around the door pillar, he observed Defendant reach low. (TR. 30.) Deputy Pratt testified he thought Defendant was reaching for a weapon. (TR. 30.)

At that point, other law enforcement officers began giving Defendant commands to turn off his vehicle and exit the car. (TR. 30-31.) Officers had their weapons drawn. (TR. 31.) Defendant did not comply and stayed in his vehicle. (TR. 31.) The windows on the Accord were tinted, so officers broke both the front passenger side and front driver's door windows so they could gain access to the vehicle and Defendant. (TR. 31.) Once the windows were out, officers

4

were able to get Defendant out of the vehicle and placed him under arrest.[4] (TR. 31.) Defendant was booked on the state arrest warrants. (TR. 53.) He was not booked on any federal charges. (TR. 53.)

At the time Defendant was removed from the vehicle, he was wearing an appendix-style gun holster, which is typically worn in the front of the body across the stomach. (TR. 31-32.) After Defendant's arrest, officers searched the Accord and located a black, Taurus .380 handgun under the front seat, which would have fit in the gun holster Defendant was wearing. (TR. 29; 32.)

Once Defendant was in custody, officers conducted a probationary search of Defendant's residence. (TR. 32.) Deputy Pratt testified that he has assisted with these types of searches in the past, but he was not involved in the search of Defendant's residence. (TR. 32; TR. 34.) Deputy Pratt testified that when weapons are found in situations such as the one at hand, officers are interested in searching the suspect's house. (TR. 33.) The search of Defendant's residence revealed a shotgun under a couch in the residence. (TR. 34-35.) Methamphetamine was found in an upstairs bedroom of the residence.[5] (TR. 34-35.) Clonazepam and ammunition were also located. (TR. 34-36; TR. 64.)

The passengers in the Accord each gave statements to police after Defendant was taken into custody. (TR. 20; Ex. 2.) The female passenger told officers that as they were leaving Defendant's house, she observed a law enforcement vehicle in front of them with its lights and sirens on. (TR. 21; Ex. 2.) She stated that as they were backing up 41st Avenue, Defendant produced a handgun. (TR. 21; Ex. 2.) She stated that after Defendant hit the Jeep, she convinced Defendant to put the gun away. (TR. 21.) The female passenger expressed to officers that she was afraid Defendant was going to start shooting. (TR. 24.) The male passenger also told police that he told Defendant not to hit the Jeep because he was fearful that they were going to get shot. (TR. 25; Ex. 2.)

---

[4] At the time this was occurring, probation officers were in the area, but not on scene. (TR. 32; TR. 61.) They did not arrive on scene until a few minutes later. (TR. 61.)

[5] Deputy Pratt testified he thought the methamphetamine was found in a purse in the bedroom. (TR. 34-35). Exhibit 2 reflects that the methamphetamine was found in a Victoria's Secret bag in the bedroom.

5

Following Defendant's arrest and in continuation of his investigation into Defendant, Deputy Pratt interviewed cooperating witness, Christopher Smith ("Smith"). (TR. 25.) Deputy Pratt believes Smith is one of Defendant's associates. (TR. 25.) Smith and Defendant were in the same mod at Douglas County Corrections for a time. (TR. 25.) Deputy Pratt testified that Smith told him that Defendant told Smith that he put a gun under the front seat of the Accord before he was arrested on December 19, 2019 hoping the rear seat passenger would take the gun charge. (TR. 27.) Deputy Pratt also questioned Smith about Defendant's narcotics distribution. (TR. 39.) Smith told him that he and Defendant would deal methamphetamine to one another. (TR. 39.) Deputy Pratt testified that Smith told him that he had once observed Defendant with a half a pound of methamphetamine. (TR. 39.) Smith also told Deputy Pratt that Defendant stayed with him after Defendant was accidently released from custody in February, 2020. (TR. 40-41.) Smith told Deputy Pratt that Defendant told him he wanted to drive to Arizona to escape. (TR. 40-41.)

Deputy Pratt also interviewed Jeremy Smith, who was in custody with Defendant and shared the same cell.[6] (TR. 27.) According to Deputy Pratt, Jeremy Smith told him that Defendant said he intentionally hit the Jeep on December 19, 2019, but did not have the momentum to move the Jeep out of the way. (TR. 29.) Jeremy Smith reported that Defendant told him that because there was no way out, he put a gun under the front seat of the Accord and hoped the rear seat passenger would take the gun charge. (TR. 27; TR. 29.) Deputy Pratt further testified that Defendant told Jeremy Smith that he wished he had the shotgun that was at his residence at the time he hit the Jeep because it would have given him a better chance to get away. (TR. 35.) Deputy Pratt testified that Smith told him that Defendant said the shotgun was located under the couch in his residence. (TR. 35.)

Deputy Pratt testified that Jeremy Smith also told him that Defendant had told him about an incident when he out-ran the police. (TR. 37-38.) On this prior occasion, Defendant had a shotgun in his vehicle earlier in the day but had taken the shotgun back to his residence before officers attempted to pull him over. (TR. 38.) In reviewing Defendant's record, Deputy Pratt saw an offense that would fit the statements by Jeremy Smith, which was what one of Defendant's warrants was for—flight to avoid arrest. (TR. 36-37.) Deputy Pratt said that Jeremy Smith

---

[6] Deputy Pratt testified that he does not believe Christopher Smith and Jeremy Smith are related. (TR. 39.)

reported that Defendant said he considered having a shoot-out with police and would have shot at police if he had the shotgun during this previous incident. (TR. 38.) Officer Pratt testified that Jeremy Smith also told him that Defendant and Smith discussed a time in 2019 when a 30-pound load of methamphetamine came to Defendant's residence. (TR. 40-41.) Smith corroborated Jeremy Smith's statement about the 30 pounds of methamphetamine. (TR. 65.)

On January 23, 2020, Defendant was indicted on three counts stemming from the December 19, 2019 incident. A superseding indictment was filed on June 17, 2020, charging Defendant with three additional counts. A second superseding indictment was filed on September 24, 2020, subsequent to the filing of Defendant's motions. Count I of the second superseding indictment charges Defendant with assault of a federal officer with a deadly weapon in violation of 18 U.S.C. §§ 111(a) and (b). Count II charges Defendant with knowingly using and carrying a firearm during and in relation to the offense charged in Count I in violation of 18 U.S.C. § 924(c)(1)(A). Count III charges Defendant with being a felon in possession of a firearm in violation of §§ 922(g)(1) and 924(a)(2). Count IV charges Defendant with possession and distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1). Count V charges Defendant with possession of clonazepam in violation of 21 U.S.C. § 844(a). Count VI charges Defendant with possession of a firearm in furtherance of a drug trafficking crime in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1) and 21 U.S.C. 924(c)(1)(A).

Defendant's counsel requested at the evidentiary hearing that the pending motions and arguments be applied to the second superseding indictment.[7] (TR. 7.) The difference between the superseding indictment and the second superseding indictment is the addition of the word "forcibly" to Count I and the identification of the dangerous weapon as Defendant's vehicle. The second superseding indictment also replaced "posses" with "use and carry" in Count II. The second superseding indictment further clarified the timeframe of Count IV.

---

[7] On November 17, 2020 the government filed a motion to dismiss the indictment and superseding indictment. United States District Court Judge Robert Rossiter, Jr. granted the government's motion on November 18, 2020. Therefore, this order will only pertain to the second superseding indictment.

**DISCUSSION**

1. **Motions to Dismiss**

Federal Rule of Civil Procedure 7 provides that an "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). "As a general rule, due process requires that the indictment give a defendant notice of each element of the charge against him so that he can prepare an adequate defense." United States v. Becton, 751 F.2d 250, 256 (8th Cir. 1984). An indictment adequately states an offense if "it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008) (quotation omitted). "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." Id.

"An indictment need not use the specific words of the statute, so long as by fair implication it alleges an offense recognized by law." United States v. Villarreal, 707 F.3d 942, 957 (8th Cir. 2013) (quotation omitted). "Only when an essential element is omitted in substance will an indictment be rendered fatally insufficient." United States v. Dierks, No. 17-CR-2065, 2007 WL 4873067, at *2 (N.D. Iowa Oct. 27, 2017). See also United States v. Mallen, 843 F.2d 1096, 1102 (8th Cir. 1988) ("An indictment is fatally insufficient when an essential element 'of substance' is omitted, rather than one 'of form' only.").

A. **First Motion to Dismiss**

In his first motion to dismiss (Filing No. 37), Defendant argues Count II should be dismissed because it fails to state an offense.[8] Count I charges Defendant with assault of a federal officer with a deadly weapon in violation of 18 U.S.C. §§ 111(a) and (b). Count II charges

---

[8] Defendant originally argued that Count I failed to state an offense and that Counts I and II should be dismissed for lack of specificity and duplicity. Defendant withdrew these arguments at the evidentiary hearing due to the filing of the second superseding indictment. (TR. 6.) Therefore, these arguments will not be addressed in this Order.

Defendant with using and carrying a firearm during and in relation to a "crime of violence," specifically, the assault of a federal officer with a deadly weapon as charged in Count I, in violation of 18 U.S.C. § 924(c)(1)(A). Defendant contends the assault charge set out in Count I is not categorically a "crime of violence" for purposes of serving as an underlying offense for Count II. Thus, according to Defendant, Count II should be dismissed. The undersigned finds Defendant's argument unpersuasive.

"Crime of violence" is defined by 18 U.S.C. § 924(c)(3) as an offense that is a felony and "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3). Courts generally use a "categorical approach" to determine whether an underlying offense involves "the use, attempted use, and threatened use of physical force against the person or property of another." See Evans v. Zych, 644 F.3d 447, 453 (6th Cir. 2011); United States v. Fuertes, 805 F.3d 485, 497–99 (4th Cir. 2015). The categorical approach "focuses on the statutory definition of the offense, rather than the manner in which an offender may have violated the statute in a particular circumstance." United States v. Denson, 728 F.3d 603, 607 (6th Cir. 2013).

Courts use a modified categorical approach "when a prior conviction is for violating a so-called 'divisible statute,' which 'sets out one or more elements of the offense in the alternative.'" Id. (quoting Descamps v. United States, 570 U.S. 254 (2013)). The modified categorical approach "permits sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction." Descamps, 570 at 257. "The court can then do what the categorical approach demands: compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime." Id.

Section 111, under which Defendant is charged, provides:

(a) In general.—Whoever—

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated [as a federal officer] while engaged in or on account of the performance of official duties; or

>(2) forcibly assaults or intimidates any person who formerly served [as a federal officer] on account of the performance of official duties during such person's term of service,
>
>shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.
>
>(b) Enhanced penalty.—Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon . . . or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111. Defendant argues that § 111(a)—without the deadly/dangerous weapon enhancement set out in § 111(b)—is not divisible and, therefore, not categorically a crime of violence. Defendant's argument is flawed, however, because the determination of whether § 111(a) is a crime of violence must be considered in conjunction with § 111(b). In other words, the Court must look to § 111(b) to evaluate whether there is an element of "the use, attempted use, or threatened use of physical force against the person or property of another" as required by 18 U.S.C. § 924(c)(3).

The undersigned finds the Sixth Circuit Court of Appeals' reasoning in *United States v. Rafidi*, 829 F.3d 437, 445–46 (6th Cir. 2016) persuasive on this issue. In *Rafidi*, the defendant was convicted of forcibly assaulting a federal law-enforcement officer and using a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 111(a)(1) and (b) and 18 U.S.C. § 924(c). On appeal, the defendant argued that a violation of § 111 was not a crime of violence for purposes of § 924(c). The Sixth Circuit stated that in order to establish a violation of § 111(b), the government had to establish a violation of § 111(a) and, thus considered "whether § 111(b)—and not § 111(a), by itself—has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id*. at 445. The Sixth Circuit upheld the defendant's conviction, finding that a violation of § 111(b) constitutes a crime of violence for purposes of § 924(c). The court further found that, in the absence of physical contact, "[t]he element of force necessary for a conviction under § 111 may be shown by "such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *Id*. at 446.

10

The parties did not cite any authority from the Eighth Circuit regarding the precise issue at hand. However, case law from the Eighth Circuit involving the Armed Career Criminal Act ("ACCA") and sentencing guidelines supports the conclusion that the Eighth Circuit would conclude that aggravated assault with a dangerous or deadly weapon under 18 U.S.C. § 111(a) is a crime of violence. *See United States v. Minnis*, 872 F.3d 889 (8th Cir. 2017) (finding that convictions for Missouri first-degree attempted assault constituted crimes of violence for purposes of the career offender sentencing guidelines); *United States v. Pryor*, 927 F.3d 1042 (8th Cir. 2019) (finding that Missouri conviction for first-degree assault constituted a predicate violent felony under the ACCA).

Here, Defendant has been charged with assaulting a federal officer with a deadly weapon, more specifically, a vehicle. The Eighth Circuit has stated that a vehicle qualifies as a "deadly weapon" for purposes of § 111(a) and (b). *See United States v. Yates*, 304 F.3d 818 (8th Cir. 2002). If a defendant drives a vehicle at a federal officer, even without making contact between their vehicles, that is enough for a conviction of assault on a federal officer with a deadly or dangerous weapon. *Id*. Deputy Pratt testified at the evidentiary hearing that Defendant used his vehicle to purposefully hit Deputy Pratt's Jeep. Deputy Pratt further testified that Defendant's actions placed him in fear for his safety. Based on this evidence and the authority set out above, the undersigned finds that the superseding indictment has alleged a crime of violence under § 111(a). Therefore, the undersigned will recommend that Defendant's First Motion to Dismiss be denied.

B.     **Second Motion to Dismiss**

In his second motion to dismiss (Filing No. 39), Defendant argues Counts I and II should be dismissed because Deputy Pratt was not acting as a federal officer as required by § 111 at the time of the events underlying the charges in the second superseding indictment. The undersigned finds this argument without merit.

Whether an officer's position qualifies as a "federal officer" is a threshold legal question for the court. *See United States v. Bettelyoun*, 16 F.3d 850, 853 (8th Cir. 1994). The listing of designated persons referred to in § 111 is set out in 18 U.S.C. § 1114, which defines officer as "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)." 18 U.S.C. § 1114. The Eighth

11

Circuit Court of Appeals has found that individuals are considered federal officers for purposes of § 111 by way of deputization, contract, or designation.

In *Bettelyoun*, the Eighth Circuit stated that a tribal officer who had been designated as a special deputy officer of the Bureau of Indian Affairs was a "federal officer" within the meaning of 18 U.S.C. § 111. *Bettelyoun*, 16 F.3d at 852-53. Similarly, in *United States v. Roy*, 408 F.3d 484 (8th Cir. 2005), the Eighth Circuit held that a contract between the Secretary of the Interior and an Indian tribe for the provision of law enforcement services delegated law enforcement functions of the Bureau of Indian Affairs to a city police department and, thus, a city officer acting as a member of the tribal police department was a federal officer. Further, in *United States v. Oakie*, 12 F.3d 1436 (8th Cir. 1993), the Eighth Circuit found that a tribal law enforcement officer who had been designated a BIA deputy special officer was entitled to the protections of §111. The Eighth Circuit's model jury instruction on § 111 claims reflects this precedent, providing that "[s]tate, local or tribal officers are federal officers for the purposes of the statute if included within the designation of 18 U.S.C. § 1114 by reason of contract, designation or deputization." 8th Cir. Model Crim. Jury Instructions § 6.18.111.

Other jurisdictions have recognized that deputized U.S. Marshals are federal officers within the meaning of § 111. See *United States v. Hoy*, 137 F.3d 726 (2d Cir. 1998) (stating that the listing of officers referred to in § 111(a) appeared in §1114 and included deputy U.S. Marshals); *United States v. Clark*, 178 F.3d 290 (5th Cir. 1999) (recognizing that deputy U.S. Marshals are officers within the meaning of § 111, noting that the statute was enacted to protect federal officers and federal functions); *United States v. Diamond*, 53 F.3d 249 (9th Cir. 1995) (finding that sheriff's deputy, who had been cross-deputized as a Special Duty U.S. Marshal and who was acting under the direction of an FBI agent, was a federal officer within the meaning of § 111).

The undersigned finds that Deputy Pratt is a federal officer within the meaning of 18 U.S.C. § 111. Deputy Pratt testified that he was deputized through the United States Marshals Service and is authorized by the FBI to investigate federal offenses. The question of whether Deputy Pratt was engaged in official duties at the time of the incident is a question of fact which must be left to the jury. See *Bettelyoun*, 16 F.3d at 852-53. Therefore, the undersigned will recommend that Defendant's Second Motion to Dismiss be denied.

## 2. Motion to Suppress

Defendant contends his Fourth Amendment rights were violated by the warrantless search of his residence and, consequently, the Court should suppress all evidence obtained from his home. Defendant argues in his brief that the probationary search was simply a tactic used for a warrantless search of his home by the Sheriff's Office. In other words, Defendant argues the probation office was a "stalking horse" for law enforcement. The Eighth Circuit has held, however, that there is no stalking horse violation if a defendant is on probation and probation searches his residence with the assistance of law enforcement. See *United States v. Brown*, 346 F.3d 808, 810 (8th Cir. 2003). In *Brown*, the Eighth Circuit recognized that *United States v. Knights,* 534 U.S. 112, 121 (2001) eliminated the stalking horse theory. Here, Defendant was on probation at the time of the search and the terms of Defendant's probation order subjected Defendant to searches by both probation and law enforcement officers. Therefore, Defendant's stalking horse argument has no merit.[9]

Defendant further contends the search of his residence was unreasonable under the Fourth Amendment. In *Knights,* the Supreme Court concluded that when a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that condition without a warrant based upon that officer's reasonable suspicion that the probationer is violating his probation's terms. *Knights*, 534 U.S. at 121–22; *Brown,* 346 F.3d at 811. The Supreme Court reasoned that a warrantless search of a probationer's house requires no more than reasonable suspicion because a probationer has "significantly diminished privacy interests." *Knights*, 534 U.S. at 121–22.

Here, officers had reasonable suspicion that Defendant was violating the terms of his probation. Defendant was on probation for possession of a controlled substance and a warrant had been issued for an alleged probation violation. Further, before the search, Deputy Pratt received information that Defendant was a methamphetamine dealer and law enforcement was investigating Defendant for narcotics distribution. Defendant's probation officer was aware that there was an investigation into Defendant's narcotics distribution. When law enforcement attempted to take

---

[9] At the evidentiary hearing, Defendant's counsel recognized the controlling precedent of *Brown* related to his "stalking horse" argument but stated he wanted to make an appellate record regarding the matter. (TR. 7.)

Defendant into custody on the warrants, he evaded arrest before driving his vehicle into Deputy Pratt's vehicle. After he was arrested, officers located a handgun in Defendant's vehicle, which would have fit into the gun holster Defendant was wearing when he was removed from the vehicle. In addition, Defendant was a convicted felon and should not have been in possession of a firearm. Probation officers were on the scene when Defendant was arrested and when the handgun was found in his vehicle.[10] Because there was reasonable suspicion that Defendant was violating the terms of his probation, his Fourth Amendment rights were not violated by the search.[11]

Finally, Defendant argues that the search of his residence exceeded the scope of the probation order. Defendant contends the terms of his probation gave him the discretion to *either* consent to a search *or* face revocation. Defendant asserts that because the terms of his probation merely subjected him to revocation if he refused to submit to searches, law enforcement should have sought his consent or obtained a warrant to search his home. Defendant further argues that once the arrest warrant was issued for a probation violation, he was no longer under the supervision of the probation office or subject to the probation order. Therefore, according to Defendant, the search of his residence was no longer a probationary search.

The terms of Defendant's probation order required that Defendant "[r]eport as directed by the Court or probation officer and permit the probation officer to visit the defendant at all times and places. The Defendant is to submit to reasonable search and seizures of his person, home, and vehicle by all law enforcement and probation officers." The language above Defendant's signature in the probation order states that Defendant received a copy of the probation sentence, that he has read and understands the conditions and that he further understands that "any violation of the above conditions is cause for revocation of probation and possible sentence to confinement." The language of the probation order does not give Defendant discretion to refuse a reasonable search of his home. Rather, the order simply advises Defendant of the consequences of failure to comply. Moreover, there is no provision in the order that states Defendant's obligations under the order or

---

[10] Deputy Pratt also testified that in situations in which weapons are found in a vehicle, law enforcement has an interest in searching the suspect's home.

[11] Moreover, there is no indication that the scope of the search was unreasonable. The record does not show that Defendant's residence was searched beyond a location where evidence of drug distribution or illegal weapon possession would be found.

14

his supervision by the probation office cease upon an alleged probation violation, the issuance of a warrant, or his arrest. Therefore, the undersigned finds Defendant's arguments regarding the terms and limits of the probation order unpersuasive and concludes that Defendant's motion to suppress should be denied.

### 3. Motion to Sever

Defendant requests that Count III be served from all other counts in the second superseding indictment and that Counts I and II be severed from Counts IV, V, and VI. Severance, as requested by Defendant, would result in three separate trials.

Pursuant to Federal Rule of Criminal Procedure 8(a), the government may charge multiple counts in a single indictment if "the offenses are of the same or similar character, based on the same act or transaction, or are parts of a common scheme or plan." United States v. Steele, 550 F.3d 693, 702 (8th Cir. 2008). Rule 8 "is broadly construed in favor of joinder to promote the efficient administration of justice." United States v. Taken Alive, 513 F.3d 899, 902 (8th Cir. 2008).

Under Rule 8, offenses are considered "of the same or similar character" if they "refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps." United States v. Lindsey, 782 F.2d 116, 117 (8th Cir. 1986) (quotation omitted). The time factor is determined on a case-by-case basis and "there is no per se rule on when the time period between similar offenses is so great that they may not be joined." United States v. Rodgers, 732 F.2d 625, 629 (8th Cir. 1984). Evidence overlaps for purposes of Rule 8 when evidence surrounding one offense would be probative and admissible at the defendant's separate trial for the other offense. Id. at 630.

For purposes of Rule 8, the question of whether offenses are based on the same act or transaction or part of a common scheme or plan should be interpreted "flexibly," requiring that the offenses have a "logical relationship" to one another. See United States v. Cardwell, 433 F.3d 378, 385 (4th Cir. 2005); United States v. Park, 531 F.2d 754, 761 (5th Cir. 1976). Offenses can be deemed to arise out of the same transaction or be part of a common plan or scheme when they are factually intertwined or are temporally related. See United States v. Johnson, 462 F.3d 815, 822

(8th Cir. 2006) (finding charges to be part of a common plan or scheme where they were connected temporally and logically). An important consideration in determining whether events are based on the same transaction or part of a common plan or scheme is whether evidence supporting the separate counts overlaps so that the same evidence would be admissible at separate trials. *See United States v. Little Dog*, 398 F.3d 1032 (8th Cir. 2005).

Once it is determined that offenses are properly joined under Rule 8, Rule 14 of the Federal Rules of Criminal Procedure specifies that the district court may nevertheless order separate trials if a joint trial would "prejudice a defendant or the government." Fed. R. Crim. P. 14. However, "[o]nly in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." *United States v. Al-Esawi*, 560 F.3d 888, 891 (8th Cir. 2009). Prejudice must be "severe or compelling" in order to grant a motion for severance. *United States v. Liveoak,* 377 F.3d 859, 864 (8th Cir. 2004). "Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that [the defendant] would have had in a severed trial." *United States v. Koskela*, 86 F.3d 122, 126 (8th Cir. 1996) (citation omitted). The defendant bears the burden of establishing prejudice. *United States v. Humphreys,* 982 F.2d 254, 259 (8th Cir. 1992).

Defendant contends the offenses are improperly joined under Rule 8. Defendant argues Count III should not have been joined with Counts IV, V, and VI because the latter counts are alleged to have taken place in the past and the evidence supporting them was found at Defendant's residence—not on the scene where Defendant was found to possess a firearm. Defendant further contends there is no evidence that the drug charges set out in Counts IV, V, and VI are related to the assault of a federal officer charges set out in Counts I and II.[12]

The Court finds joinder under Rule 8 proper. Critical events underlying each of the counts occurred on the same day and in the same series of acts and transactions. Defendant was wanted on two warrants, one of which was for an alleged probation violation for possession of a controlled substance. The alleged assault at issue in Counts I and II occurred while officers were attempting

---

[12] Defendant acknowledges that Count III is related to the alleged assault but argues the introduction of Defendant's prior felony conviction will cause him severe prejudice.

to serve the warrants. The firearm that is the subject of Counts II, III, and VI was located during the search of Defendant's vehicle immediately following the assault. Defendant's residence was searched following his arrest based on the terms of the probation order and the discovery of the firearm in the vehicle, at which time the drugs at issue in Counts V and VI, as well as one of the firearms at issue in Count VI, were located. All events occurred in a continuous sequence over a short period of time and certainly have a logical relationship.

The drug distribution and possession charge alleged in Count IV is also logically linked to his choice to resist arrest, decision to drive his vehicle into Officer Pratt's Jeep, and consequent discovery of weapons and controlled substances. If Defendant did not have a warrant for a probation violation for a drug offense, then he would not have had to evade arrest and assault Deputy Pratt during Deputy Pratt's attempt to take him into custody and question him about drug distribution. Evidence surrounding each offense would be probative and admissible (as discussed in more detail below) at Defendant's trial for the other offenses as the evidence overlaps and is intertwined. Therefore, there is no misjoinder under Rule 8.

The next question that must be addressed is whether Defendant would be prejudiced by a single trial on all counts. Defendant contends Count III—the felon in a possession of a firearm charge—should be served from all other counts because the introduction of his prior felony conviction will cause him severe prejudice. Defendant argues that in determining whether he assaulted a federal officer, the jury should not be permitted to hear evidence that he is a convicted felon. Similarly, Defendant contends the jury should not be able to hear evidence of his previous drug conviction in a trial on Counts IV, V and VI, all which charge Defendant with drug related offenses. Further, Defendant asserts he would be prejudiced if the jury was asked to consider whether he assaulted a federal officer in conjunction with allegations of drug use or distribution. Defendant contends he would subject himself to self-incrimination if he decided to testify regarding the assault charges because he would then be forced to answer questions regarding his involvement with drugs. The Court finds Defendant's arguments regarding prejudice unpersuasive.

Defendant cannot show he would be severely prejudiced through a single trial on all offenses because the evidence for each offense would be admissible in a trial for the other. The

17

Eighth Circuit Court of Appeals has made clear that "[n]o prejudice results from the refusal to sever when evidence of one charge would be admissible in a separate trial on the other." *United States v. McCarther*, 596 F.3d 438, 442 (8th Cir. 2010). Here, Defendant's arrest and the subsequent search of his home are inextricably intertwined because evidence surrounding one is necessary to tell the story of the other.

Defendant's decision to evade arrest as charged in Count I is evidence of a guilty conscience for the other charged offenses. *United States v. Martinez*, No. 3:06-cr-14-17, 2008 WL 700321, at *2 (D.N.D. Mar. 13, 2008) (stating that "evidence of flight or escape from custody is admissible and has probative value as circumstantial evidence of consciousness of guilt"). *See United States v. Urbina*, 431 F.3d 305 (8th Cir. 2005). It is reasonable to conclude that Defendant's decision to evade arrest and assault the federal officer stemmed from his knowledge that he was a felon in possession of a handgun. It is also a reasonable inference that Defendant's decision to flee his residence was based on his knowledge that there was contraband and evidence of possible drug distribution inside his home. Moreover, it is reasonable to conclude that the firearms in Defendant's vehicle and home aided the drug possession and distribution and motivated the assault on Deputy Pratt.

Further, evidence that Defendant possessed a handgun as alleged in Counts II, III, and VI would be relevant in a trial on one another because "[e]vidence that a defendant possessed a firearm on a previous occasion is relevant to show knowledge and intent." *United States v. Walker*, 470 F.3d 1271, 1274 (8th Cir. 2006). Evidence of Defendant's prior drug conviction would likewise be admissible to show the absence of mistake and knowledge of the controlled substances recovered from his residence. Because evidence of each offense would be admissible in a trial of all the others, Defendant will not be prejudiced by a single trial on all charges. Further, to the extent there could be any prejudice, such prejudiced could be cured through a limiting instruction to the jury. Therefore, severance is unnecessary.

Accordingly,

**IT IS RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's First Motion to Dismiss (Filing No. 37), Second Motion to Dismiss (Filing No. 39), and Motion to Suppress (Filing No. 41) be denied.

**IT IS ORDERED** that Defendant's Motion to Sever (Filing No. 44) is denied.

Dated this 21st day of December, 2020.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection